UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GREGORY CHAD WALLIN-REED,

Petitioner,

v.

ERIC ARNOLD,

Respondent.

No.  2:17-cv-01495-TLN-CKD (HC)

FINDINGS AND RECOMMENDATIONS

Petitioner is a state inmate proceeding pro se with a federal habeas corpus application filed pursuant to 28 U.S.C. § 2254.  ECF No. 1.  Petitioner challenges his conviction following a jury trial in the Plumas County Superior Court for first degree murder, discharging a firearm at an occupied vehicle, five counts of assault with a firearm, and possession of an assault weapon. Petitioner was sentenced to 50 years to life plus a determinate term of 34 years.  Respondent has filed an answer and petitioner has filed a traverse to the petition.  ECF Nos. 26, 28.  Therefore, the claims have been fully briefed by the parties.  ECF Nos. 12, 22.  Upon careful consideration of the record and the applicable law, the undersigned recommends denying petitioner's habeas corpus application for the reasons set forth below.

I.      **Factual and Procedural History**

**A.  Direct Appeal Proceedings**

Following his conviction, petitioner filed a direct appeal.  On February 11, 2016, the

1

California Court of Appeal affirmed the judgment of conviction, but ordered an amended abstract of judgment to be prepared based on errors in the original.  See ECF No. 26-1 (direct appeal opinion).  In rendering its decision, the California Court of Appeal summarized the facts as follows:[1]

> On Friday night, July 1, 2011, Rory McGuire, Justin Smyth, Robert Osornio, John Chanley, Tommy Chanley, and Joe Crawford went to Antelope Lake looking for a party. Having failed to find the party, they headed home in the early morning hours of July 2. On the way home, McGuire stopped his car in the road in front of petitioner's cabin.[2] Tommy Chanley pointed out a sign posted on petitioner's property which read: "'Warning. You are entering the R.O.C. This is a restricted area. Only red-blooded patriotic Christian Americans are authorized for access upon approval and verification of credentials by the commanding authority. The use of deadly force is authorized for use on those found in noncompliance with above.'" According to Craig Schermerhorn, a friend of petitioner, "R.O.C." stood for "Republic of Chad," "Chad" being the name that petitioner goes by. Tommy pointed out a second sign as well. After Tommy shone a spotlight they had in McGuire's car on the sign, Joe Crawford got out of the car, removed one of the signs, stole a solar light from petitioner's property, and returned to the car. McGuire then drove the group back to Susanville.

> Schermerhorn and his wife Jennifer were staying on petitioner's property in their pop-up trailer over the July 4th weekend in 2011. On Saturday morning, July 2, petitioner told Schermerhorn that someone had stolen a solar light from his property the night before and that there was "suspicious activity at the entrance to [petitioner's] property and around [Schermerhorn's] trailer." He told Schermerhorn that he had seen someone shining a spotlight on his property. Petitioner and Schermerhorn located multiple footprints that did not match the shoes worn by petitioner or the Schermerhorns.

> On the afternoon of Saturday, July 2, 2011, McGuire, Smyth, Osornio, the Chanley brothers, and Cesar Gonzalez met in Susanville for a barbecue. After the barbecue, they decided to go to Antelope Lake to meet up with some girls. All six went in McGuire's vehicle. That vehicle did not have license plates. McGuire drove and Gonzalez rode in the front passenger seat. Seated in the back seat, from the driver's side to the passenger side, were Smyth, Osornio, John Chanley, and Tommy Chanley. They brought a bottle of blueberry vodka and some 40–ounce beers. They planned to stay at Antelope Lake for the night.

> On Saturday evening, petitioner did some target shooting on his property

---

[1] Petitioner does not rebut the presumption of correctness that applies to these state court findings of fact nor does he argue that they are based on an unreasonable evidentiary foundation.  See 28 U.S.C. § 2254(e)(1); Gonzalez v. Pliler, 341 F.3d 897, 903 (9th Cir. 2003).  Therefore, they are reproduced in their totality and relied upon by this court in conducting its legal analysis.

[2] Due to the procedural posture of this case, all references to "defendant" in the direct appeal opinion have been changed to "petitioner."

with an AR–15–style assault rifle equipped with a laser sight. When he was finished shooting, petitioner set the rifle down on the porch. Petitioner, his family, the Schermerhorns, and another couple who were staying on the property for the weekend were nervous because of what had occurred at the property the night before.

On the way to Antelope Lake Saturday night, McGuire again stopped in front of petitioner's property. Schermerhorn observed the vehicle and alerted petitioner. Gonzalez got out of McGuire's car to steal a solar light from petitioner's property. Petitioner grabbed his AR–15 and fired a warning shot "down range" and into the air. Gonzalez and Smyth heard the gunshot, Gonzalez got back in the car, and McGuire sped away. Petitioner, who was still holding the AR–15, went to his truck and drove away quickly. Schermerhorn subsequently heard two or three gunshots fired at a distance. He then went to his trailer and retrieved a .40–caliber Beretta he kept for protection, but he stayed at petitioner's property.

After McGuire had driven a half a mile to a mile, the passengers saw headlights behind McGuire's vehicle and realized that they were being followed. Smyth observed a green laser light shining from the vehicle behind them through their rear window. Gonzalez saw the green laser and then a red laser. They then heard shots and the sound of bullet strikes. Gonzalez testified he heard many shots, then a pause as if the shooter were reloading, and then more gunshots. After the gunfire began, Gonzalez shone the spotlight at petitioner in an effort to blind him. Gonzalez said his head and upper body were outside of the front passenger window when he aimed the spotlight rearward. When Gonzalez heard a bullet whiz by his head, he determined that what he was doing was not a good idea and brought the spotlight back into the car. Thereafter, the passengers threw the solar lights out the window. Gonzalez then waved a white shirt out the window to signal their surrender. Petitioner did not stop shooting.

McGuire missed a turn and drove onto a dirt road in a meadow. After McGuire made a U-turn to return to the paved road, the McGuire vehicle and petitioner's truck passed each other traveling in opposite directions, and multiple gunshots fired in rapid succession struck the McGuire vehicle. According to Gonzalez, "gunshots unloaded into the car." Several windows shattered and exploded. McGuire was struck, Smyth was shot in his right calf, and Osornio was shot in his right leg. With McGuire suddenly unresponsive, Gonzalez moved McGuire's leg and depressed the brake pedal with his hand. The car came to a stop off of the road. The Chanley brothers and Gonzalez then exited the car and ran.

Petitioner approached the McGuire vehicle holding a rifle and stated, "'You motherfuckers come by my house and shoot. I got kids,'" or something similar. Osornio and Smyth both responded that they had not shot at petitioner's house. Smyth and Gonzalez both testified at trial that no one in McGuire's vehicle had a gun or any type of weapon, and that none of them had shot at petitioner's house. Smyth testified that they had not shot at petitioner's house the night before either. Smyth pleaded with petitioner to call an ambulance. Petitioner walked around McGuire's vehicle, returned to his vehicle, and left.

After petitioner departed, the Chanley brothers and Gonzalez returned.

3

They removed McGuire from the driver's seat because "he was in bad condition...." He was unresponsive, he was missing fingers from his left hand, and "it was pretty apparent that there was something seriously wrong." Occasionally McGuire would speak, but he was largely incoherent. Smyth's leg was bleeding substantially. He fashioned a tourniquet from his belt and applied it above his knee. Gonzalez attempted to start the vehicle, but it would not start. The car's oil pan had been ruptured on a rock in the meadow and had leaked a trail of oil. No one's mobile phone had service. The group decided that Gonzalez and Tommy Chanley would run to try to find help. Gonzalez and Tommy Chanley left, and, after running for a long time, they found a trailer near a campsite at the lake. The occupants did not have mobile phone service, but offered to take Gonzalez and Tommy Chanley to the campground. At the campground, they spoke with the camp host.

When petitioner arrived back at his cabin, he told Schermerhorn that he may have killed someone. Petitioner did not tell Schermerhorn that anyone had shot at him. Between 15 and 30 minutes later, petitioner drove to the bottom of the Janesville Grade to report the incident. Petitioner met with Sheriff's Deputy Juan Cervantes and Department of Fish and Game (now Department of Fish and Wildlife) Warden Kyle Kroll. Petitioner told Cervantes he may have shot someone. Cervantes directed petitioner to wait for the next available deputy. Petitioner warned Cervantes, "Be careful. There may be kids out there with guns." He said the kids "possibly" had firearms, but did not say he had been shot at. Cervantes and Kroll left for Long Point Campground.

Cervantes and Kroll met Gonzalez and Tommy Chanley at the campground. Both seemed "very scared." Gonzalez and Tommy Chanley directed the authorities to the location of McGuire's vehicle. Two to three hours after Gonzalez and Tommy Chanley first left the meadow, law enforcement arrived at the scene.

Sergeant Todd Johns arrived at the meadow with two Department of Fish and Game officers as well as members of a film crew who had been in the area filming for *Wild Justice*. Johns secured the scene and then attempted to render first aid. Other emergency personnel responded. Detective Chris Hendrickson interviewed both Gonzalez and Tommy Chanley. A recording of his interview with Gonzalez was played for the jury. We discuss that interview, *post*.

Deputy Steve Clark met petitioner at an arranged location. Clark interviewed petitioner, and recorded the interview. Clark's interview with petitioner was played for the jury. Petitioner described getting in his vehicle and chasing the McGuire car after its occupants took his solar lights. He claimed he saw muzzle flashes from the McGuire vehicle during the chase, and stated that he thought someone in that vehicle was shooting at him as well as shining the spotlight at him. He stated that he continued to follow the car after it turned onto a dirt road and made a U-turn in an effort to "ditch" him. Petitioner said he then pulled out his pistol, and he shot. He then stated, "And I swear to God I killed the kid." Petitioner continued, "[T]hey turned. I nailed 'em through the windshield. They went down about a quarter mile, car went off the side of the road and I pulled up and I got out and I had my pistol out." Petitioner, described his verbal exchange with the occupants of the McGuire vehicle:

4

"You know, 'You could [have] killed my kids,' and shit and they're like, 'Hey man. We're sorry. We give up. We think our buddy's dead.' And I looked over and I think I killed the driver." Petitioner said the person in the McGuire vehicle with whom he spoke stated that they did not have a gun. Petitioner continued to state that he believed he had killed one of the occupants of the McGuire vehicle, and then stated, "And I served five years in the flipping military and I killed people on the other side of this world. And don't need to fuckin' kill kids in my state."

Sergeant Steve Peay and Detective Bill Elliot interviewed petitioner in the early morning hours of July 3, 2011. This interview was recorded, and the recording was played for the jury. Petitioner's account of the events in this interview was largely consistent with the account he reported to Clark.

Petitioner told the investigators that he saw a person running off with two lights. "So I ran off my deck and I said, 'I'm gonna go get these sons of a guns—or sons of a bitches, is actually what I said." He said he caught up to them and was about 50 feet behind them when they shined a spotlight on him; he guessed they did that to distract him. Next he heard the report and saw flashes from a firearm, so he returned fire, firing four rounds from his handgun. The McGuire vehicle turned down a dirt road and made a U-turn in an effort to lose him. Petitioner fired three shots, then got out of his truck. He said he saw the car "kinda I guess wreck," got back in his truck and "jammed after them." He said, "I got up to the car and I jumped out with my firearm and, uh, this kid he's, 'I give up. I give up man. I didn't mean to do anything.' I was like, 'What the fuck are you guys doing? I got kids up there. What the hell are you guys doing this for? What the hell did I do to you?' They were like 'We're just fucking around, didn't mean to do anything. I think our friend's dead.' I said, 'Jesus Christ. You scared the crap outta me.' And they're like, 'Please man, don't kill us.' And I went around to the driver's side. The kid was shot. The windshield—or the driver's side window was blown out. I said, 'You guys stay fuckin' here. Get some fuckin' help or something. I'm gonna go fuckin' call the cops. I could a fuckin' killed y'all.' I went back to the cabin. I said, 'Hey, I gotta fuckin' call the sheriff. I think I killed somebody.' That kid was fuckin' paying for his life."

Elaborating on what he said to the people at the cabin when he left to initiate the chase, petitioner told the Sheriff's investigators someone at the cabin asked him what he was going to do and he responded, "'I'm gonna go get these sons of bitches. I'm gonna fuckin' get their license plate or something.'" He said neither he nor the people who stole the lights fired any shots while he was at the cabin.

Petitioner told the officer that the spot light and muzzle flash during the chase came from a person who was sitting in the right rear passenger seat. He said the guy was "leaning all the way out of the freaking car." Later, petitioner said "the kid was leaning—like half his torso was leaning out of the window," and petitioner said the kid had the spot light and something else in his hand, which petitioner said he thought was a gun, but could not be sure. Petitioner indicated that when he walked up to the car at the end of the pursuit, this person was begging for his life. Petitioner described this person as being a "young kid. Maybe 18, 19 years old." There was nobody in the front passenger seat at this time.

5

Describing the chase along the winding road between his cabin and the meadow, petitioner stated, "I'm good at that. That's what the military trains you to do is to fuckin', you know, react. They train you to do that shit, react on foot, react on fuckin' cars." Petitioner further stated, "Those kids didn't stand a fuckin' chance." Asked what he was thinking when he got out of his truck, petitioner responded, "[H]ow fucked up these fuckin' kids are for doing this shit. Just fuckin' you snap into a fuckin' mode and it's like...." He continued, "It's just I know I've been out for ten years, but fuck, you know, I was a fuckin' ranger."

Later, the investigators asked petitioner additional questions about what happened after he fired the last shots at the McGuire vehicle. Petitioner said after he fired at the car, "[t]hey went down then all of a sudden he went off the side of the road and it almost looked like he went into the fence. And that's when I rolled up on 'em and jumped outta the truck." Petitioner said he parked his truck alongside the McGuire vehicle about five to ten feet apart, "right parallel with them." He "[t]hrew open the door and drew down on 'em." He was pointing his pistol at the occupants of the car, and the "kid" in the back seat was yelling, " 'Please don't kill us. We give up man. We give up.' " Petitioner estimated he was within two feet of their car. Petitioner said he then walked around the front of the McGuire vehicle and looked at the driver.

Petitioner was asked why he approached the McGuire vehicle after it had come to a stop instead of leaving. "What ... was going on inside your head at that moment ... instead of taking off, splitting and—and, you know, cleansing yourself of any threat ... you actually go to the threat?" Petitioner responded, "I guess that's what you're trained to do. [¶] ... [¶] To neutralize the threat, to—to secure it. [¶] ... [¶] If—if you're engaged you don't just fire rounds and walk away. You engage the objective. [¶] ... [¶] And—and make sure that the objective is no longer a threat." Petitioner said he did not know what the occupants of the car might do. He said he did not know if they might start shooting at him or go back to his cabin and kill his kids.

When asked to explain how the occupants of the McGuire car were a threat to his kids, petitioner said that the night before he had heard an altercation, like somebody fighting, yelling, and cursing. He saw a car and heard a loud noise, which petitioner said sounded either like them hitting something or a gunshot. Petitioner admitted when they returned the next night and then took off, the threat was "[n]eutralized." He said he followed the McGuire vehicle to get the license plate number.

Later, discussing whether or not he could have been mistaken about being shot at during the pursuit, petitioner stated: "[T]here's no way. When the guy has a spotlight shining at ya and it's a steady light and all of a sudden you see a flash and then the report." When asked whether he thought his truck had been hit by gunfire from the McGuire car, petitioner responded that he did not think it had, and then added, "And—and the thing is, is this. Okay. I—I don't think about shit like that because you—you don't—you—ten years is a long time but still, you know, when shit happens after you've been through shit it's like boom, it's right there. You don't think about it. You don't f—you know, you're going along and all of a sudden you're engaged, your buddy goes down." He continued, "Your main

6

objective is that you know don't drop and take care of your buddy. Your main objective is to push forward." Petitioner had told the investigators he had the occupants of the car "dead to rights." When asked what he meant by that, petitioner responded by saying, "What I am saying is that when I shoot—I'm good. [¶] ... [¶] And I'm not bragging. I'm not saying—I'm good. I—I shoot a lot. I mean I—that's the fucked up part, you know? What—what—what do these kids have against me? I mean what—what—it's one thing when you're engaged in an enemy that's been trained in—in combat tactics. It's another thing where you got a kid that's just, you know, shooting randomly or—or whatever." He later described going "into this zone ...," and continued, "I thought I was over this tough shit.... We'll go sit there and, you know, this—they talk about Post Traumatic Stress Syndrome and shit like that. I'm like, 'Yeah. I don't feel anything about that. Yeah. I think I'm just fine.' But every now and then you hear a song or somebody says something to you or something happens and it's like minutes of your life. You—they're gone because you—you go back to freaking memories." Petitioner stated that he did not recall every detail of the incident because he "got into a zone, shit was happening. Shit was going down and [he] was reacting off of natural instinct. [His] trained instinct."2

FN 2: At the close of the defense's case, the court read into the record a stipulation. The stipulation stated: "'Regarding the petitioner's military records, the prosecution and the defense have stipulated that, one, the petitioner is not an army ranger but worked and served in association with army rangers; two, petitioner received extensive combat training during his years of service; and three, petitioner did not serve in a designated combat theater of operations.'"

In this interview, petitioner indicated that the gun he used was a .380 automatic handgun which had been in his truck. Petitioner said he changed magazines when he turned onto the dirt road. He said he thought the car might stop, and the occupants might get out and come at him. He repeated that he only fired three shots in the meadow. While he said he had the AR–15 in his truck, he did not mention shooting it during this interview. Detective Elliott was under the impression that petitioner had only fired his handgun.

Towards the end of the interview, the investigators told petitioner he did the right thing by calling the Sheriff. Petitioner responded, "Nah. No, I—the right thing would have been to just fuckin' give it up and then call and say, 'Hey, you guys need to do some extra patrols.'"

After their initial interview, Peay, Elliott, and petitioner went to petitioner's cabin. From petitioner's cabin, Peay recovered the AR–15–type rifle, specifically a .223–caliber Bushmaster XM–15. It was equipped with a red-dot scope, a green laser on the right-hand side, and a light for nighttime illumination. Peay also recovered the 20–round magazine from the weapon, which contained four live rounds. Additionally, Peay recovered a Ruger .380–caliber handgun outfitted with a red laser. He also recovered two six-round magazines associated with the Ruger. One magazine was empty and the other contained two rounds. From the area in front of the cabin's deck, Peay recovered a single .223–caliber cartridge casing.

After leaving petitioner's cabin, they drove the route to the meadow and

petitioner showed the investigators where he said he had exchanged gunfire with the McGuire car during the pursuit. Petitioner had told the investigators he knew "exactly" where that had taken place. It was close to a place called Family Tree. Thereafter, they followed the route to the meadow. After the investigators and petitioner arrived at the meadow, while law enforcement personnel were still on the scene, petitioner was asked whether he ever shot his assault rifle. For the first time, petitioner said that he had. Petitioner stated that he first fired the AR–15 at the McGuire vehicle when the vehicles were coming off of the dirt road into the meadow. Then, when the McGuire vehicle turned around in the meadow, petitioner "grabbed the AR and [he] swung it out the door and ... popped off the rounds at them with the AR." He said he fired when the McGuire vehicle was "broadside" to him. Petitioner estimated that he fired six or seven rounds from the AR–15. Petitioner also acknowledged that, when he approached the stopped McGuire vehicle, it was the AR–15 he was holding and pointing at the occupants of that vehicle. He told the investigators that the .380 was in the truck and he was holding the AR–15 at that time because it was dark and the AR–15 had a light on it.

Later on July 3, while in custody at the Plumas County jail, petitioner spoke to his father on the phone. The call was recorded. During the conversation his father indicated he felt sorry for petitioner, and petitioner replied, "[I]t's not your fault, it's mine." He then added, "I just got freaked out by my kids, people screwing around, and I uh, I just uh, I just lost it. Just went in ... [¶] ... [¶] ... went into a little bit of a zone. [¶] ... [¶] So uh, and it got out of control...." Petitioner went on to say, "I let everyone down on this," and when his father replied, "Well, it's just ... a shame," petitioner replied, "Enough, I just had enough." While earlier in the conversation, petitioner answered affirmatively to his father's question about whether what he did was self-defense, petitioner never told his father that he had been shot at.

Detective Jeremy Beatley worked the crime scene in the meadow. He initially recovered seven .223–caliber cartridge casings. Two additional .223–caliber cartridge casings were located on the dirt road north of McGuire's vehicle. On July 13, he returned to the meadow and discovered one additional .223–caliber cartridge casing.

On July 6, Sergeant Matthew Beatley, participated in a search along the road between petitioner's cabin and the meadow. He discovered one .380–caliber cartridge casing. He also found two .25–caliber cartridge casings along the road approximately five to ten feet apart. As he proceeded along the road towards the meadow, he discovered two more .380–caliber cartridge casings.

On July 16, 2011, Deputy Michael Grant participated in a search of the route from petitioner's cabin to the meadow. Grant's team found five .380–caliber cartridge casings at different locations along the east side of the road. Three of the .380 casings were close together, two within one and one half feet of each other and the third within 10 feet of the two. They also found a solar light along the road. Grant's team also discovered several .17–caliber and .22–caliber rimfire cartridge casings. Grant testified that it was not uncommon to find shell casings on the route his team searched because a lot of people go to the area to shoot.

During the course of the investigation, Hendrickson and another detective drove the entire route from petitioner's cabin to the meadow. It took them 10 minutes and 37 seconds to drive that route while traveling at speeds between 35 and 60 miles per hour. The distance was approximately 7.7 miles. They also measured the distance from the meadow to the trailer where Gonzalez and Tommy Chanley got a ride to the campground. That distance was 3.8 miles. Hendrickson testified that, in the course of his investigation, he discovered nothing that would confirm petitioner's claim that the victims shot a gun from their car as they were being chased by petitioner.

Allison Murtha, manager of the forensic department at RJ Lee Group (RJ Lee), which, among other things, performs analysis on gunshot residue tests, testified as an expert in the field of primer gunshot residue analysis. Murtha testified that there were three elements contained in gunshot residue: lead, antimony, and barium. Those three elements are present in the plume, or cloud of smoke which is created upon the discharge of a firearm, and condense together into single particles containing all three elements. Tests may reveal the presence of one-component, two-component or three-component particles. According to Murtha, the most important distinction among these particles is that one- or two-component particles may be from sources other than the discharge of a firearm, such as fireworks, brake dust, or the deployment of an air bag. One-component particles necessarily may come from an even broader range of sources. However, three-component particles can definitively be said to result from the discharge of a firearm.

On December 19, 2011, RJ Lee received five gunshot residue kits from the Plumas County Sheriff's Office. These kits contained the gunshot residue tests performed on the Chanley brothers, McGuire, Gonzalez, and Smyth.3 Murtha testified that none of the kits contained three-component gunshot residue particles. However, the tests performed on McGuire, Gonzalez, Tommy Chanley, and Smyth revealed the presence of one- and two-component particles. There were no results for the samples derived from John Chanley because the collection kit used to collect his samples was outdated, and RJ Lee no longer performed analysis on that type of kit.

FN. 3: Sergeant Peay acknowledged that a gunshot residue test was not performed on Osornio. Peay testified that Osornio had been released from the hospital quickly and officers were not able to obtain a gunshot residue kit from him.

Murtha testified that it would not be unusual for a victim who had been shot to have one- or two-component particles on them. She also testified that, if someone discharged a firearm in a particular location in close proximity to several individuals, and samples were taken from those individuals immediately thereafter, she would expect to find three-component particles in those samples. On cross-examination, Murtha acknowledged that the mere absence of three-component gunshot residue from all of the samples did not definitively establish that none of the individuals fired a gun or that none of them were in close proximity to a gun being fired.

John Brogden, an expert in the field of crime scene investigation employed by the California Department of Justice (DOJ), testified about

his examination of the vehicles involved in this case. Brogden catalogued and recorded the apparent trajectories of the bullet strikes on McGuire's vehicle. Brogden testified that one .380–caliber bullet recovered in the trunk of McGuire's vehicle had struck the vehicle's tail light. Another .380–caliber bullet was recovered from the trunk area. There was also an apparent grazing bullet strike on the front windshield. There were three bullet holes on the driver's side of the vehicle. One went through the driver's side "A" pillar, which is the pillar near the side view mirror that separates the driver's side window from the front windshield. Another went through the rear portion of the driver's side window, which had been shattered, through the driver's headrest and probably exited through the open front passenger window. The other bullet went through the driver's side rear door in the area of the footwell. Brogden testified that, assuming that these bullet holes were caused by .223–caliber rounds fired by an AR–15, he would expect to find evidence of lead in the vehicle because ".223 rounds are notorious for fragmenting." He clarified that .223 rounds have small bullets that move very quickly, and when they strike an object, they tend to fragment. The size of the bullet fragments could range from the size of the bullet down to microscopic fragments. Brogden testified that no cartridge cases were discovered in McGuire's vehicle. But he did find a spotlight, plugged into the cigarette lighter in the dashboard.

Brogden also examined and documented anything that could be characterized as a bullet strike on petitioner's truck. There was some plastic molding that had been broken, and a couple of linear scratches on the hood of the truck. With regard to the broken plastic molding on the front grill of petitioner's truck, Brogden testified that he examined the area behind it and the radiator and did not find evidence of impact one would expect from a bullet. He opined that this defect was not from a bullet strike. With regard to one of the scratches, Brogden testified that "it was not something that I perceived as a bullet strike. It's not consistent with a grazing blow at all...." Also, the scratch tested negative for the presence of lead. Brogden also testified that a couple of marks on the driver's side front bumper of petitioner's truck were not visually consistent with a bullet strike. A lead test on these marks also yielded a negative result. On cross-examination, Brogden acknowledged that he did not perform a test on these marks that would have detected the presence of copper, in which some bullets are jacketed.

Brogden observed three cartridge cases in the bed of the truck. Inside the cab, underneath the seat, Brogden found a box containing various ammunition. He also found a box of .380–caliber auto ammunition, five high-capacity magazines containing what appeared to be .223–caliber rounds, and numerous shotgun shells. Inside the truck, Brogden found one cartridge case in the center console area underneath a cup holder. He also found a cartridge case in the gap underneath a windshield wiper.

Don Dunbar, a senior criminalist with the DOJ, testified as an expert in the field of firearms examination and crime scene investigation, including detection of gunshot residue. Based on the tests he performed, Dunbar concluded that four .223–caliber cartridge cases recovered in the meadow were fired from petitioner's Bushmaster AR–15 rifle, and five more found in the same location could have been. One .223–caliber cartridge case from north of the others in the meadow was fired from petitioner's

10

Bushmaster AR–15, and a second cartridge case found in that location could have been. Dunbar also examined the projectile recovered from McGuire's brain. It was the interior of the bullet, so it did not have any rifling markings on it to conclusively connect it to petitioner's Bushmaster AR–15. But Dunbar did compare the interior design of the projectile to the .223 ammunition submitted with petitioner's Bushmaster AR–15, and determined that the projectile from McGuire's brain was consistent with that ammunition. Dunbar testified that the bullet fragments recovered from the center console of McGuire's vehicle were also consistent with the style characteristics of the ammunition submitted with petitioner's Bushmaster AR–15. Dunbar noted that the number of the width and groove impressions on these fragments was the same as that for ammunition fired from petitioner's Bushmaster AR–15, but there was insufficient detail to opine whether those fragments had or had not been fired from petitioner's weapon.

A bullet recovered from the trunk of McGuire's vehicle and a bullet recovered from the rear bumper of McGuire's vehicle were both .380–caliber bullets fired from petitioner's .380 Ruger. Five of the eight .380–caliber cartridge cases recovered along the road between petitioner's cabin and the meadow were fired from petitioner's Ruger. A .380–caliber cartridge case recovered from inside petitioner's truck was fired from petitioner's Ruger.

Dunbar testified that the three .380–caliber cartridge cases found in a cluster together along the road between the cabin and the meadow were not fired from petitioner's Ruger, although there were indications that they were fired from the same weapon. Dunbar testified that someone very proficient could fire a double-action semi-automatic handgun perhaps twice per second, and if such a person fired two shots per second from such a gun while traveling in a car at approximately 50 miles per hour, one would expect to find the ejected cartridge cases at distances approximately 36 feet apart rather than a foot to a foot and a half apart.

As part of his work on the McGuire vehicle, Brogden applied sheets of filter paper to various parts of the McGuire vehicle for purposes of sodium rhodizonate testing, which reveals the presence of lead. The parties focused on FPS–2, an overlay that was draped over the window opening of the passenger-side front door with the window in the fully rolled down position. Part of the overlay was on the exterior and part was on the interior of the door.

Dunbar reviewed the sodium rhodizonate filter paper overlays. He testified that he was not surprised that these tests detected the presence of lead inside McGuire's car because several bullets had been fired into the car. Moreover, several of these shots were fired from a high-powered rifle, and .223–caliber bullets fired from such rifles tend to fragment when striking something hard. It is common to find large quantities of lead in an area into which a high-powered rifle bullet has been fired. Dunbar elaborated, "As the bullets break up, they expose the lead on the interior of the bullet, and the breaking up tends to spread the lead in different directions, depending on the angle and velocities it strikes at. So it's expected to find it in a vehicle that has been shot into like that." The upper part of FPS–2, which came from the interior of the front passenger door, had the classic pattern of particulate gunshot residue resulting from

11

high-velocity bullets entering the passenger area of the car and fragmenting.

Dunbar testified that the lower pattern found on FPS–2, the filter paper overlay corresponding to part of the exterior front passenger door, could be from someone firing a gun nearby, but he testified that the pattern did not have the appearance of a vaporous nature he would expect to see under such circumstances. A vaporous pattern is one that does not involve separate particles striking the surface; rather it is "so finely dispersed that it is like a faint, cloud-like kind of pattern. It's even. It's difficult to see the separate little particles in there." This pattern did not have the appearance Dunbar would expect to see from someone firing a gun in a close proximity. It included some particulate-type pattern, and was not a true vaporous-type pattern. Based on his review of the Wild Justice video showing emergency and law enforcement personnel opening or near the passenger side doors, Dunbar opined that this lead deposit could have been the result of transfer contamination of the lead from one location to the location from which FPS–2 was taken.

Dunbar performed an experiment whereby he attempted to duplicate the lead patterns found on the exterior portion of FPS–2 by firing three different handguns, including a .380–caliber pistol, next to the front passenger door of the vehicle, each from three different distances. These tests did not result in any patterns like those found on the filter paper overlays taken from McGuire's vehicle.

Dunbar did not believe that the lead detected on FPS–2 resulted from a gun being fired from McGuire's vehicle. Dunbar further testified that it would be difficult to produce the lead pattern present on FPS–2 by firing a gun pointed towards the rear of the vehicle because the weapon would have to be very close to the surface of the door and the side mirror would interfere with holding the gun in that location. On cross-examination, however, Dunbar acknowledged that a gun could be fired perpendicularly at a pursuing vehicle from the passenger side window if the car was taking a right hand curve. Further, Dunbar said he could not rule out any possibility of a gun being fired from outside the window of the vehicle.

Dunbar also examined filter paper overlays taken from the driver's side of petitioner's truck. No lead was discovered.

Thomas Morgan, a consultant with the R.J. Lee Group,[4] testified as an expert in the field of crime scene reconstruction, including gun powder residue and range determination. Morgan reviewed a number of materials, including the report prepared by defense expert Richard Ernest, which we discuss *post*. Morgan testified that the pattern on FPS–2 was consistent with particulate lead, perhaps from a projectile that fragmented and dispersed after moving through an object, resulting in a vaporous lead reaction. Morgan testified that it was not uncommon for a bullet that passes through a hard object, such as a vehicle's A-post or one of its windows, to fragment. Morgan opined that lead was discovered on the front passenger side of the vehicle because projectiles perforated the driver's side A-post and passed through the cabin toward the front passenger side. Morgan testified that such lead can be microscopic because, when a projectile strikes a hard object and fragments, some of

the fragments can vaporize. Morgan acknowledged that the presence of the lead could result from an individual reaching a gun out the window, holding it between the side-view mirror and the A-post of the vehicle, and discharging it towards the rear of the vehicle. However, based on the pattern of the lead residue, Morgan's opinion was that the particulate lead on the right front passenger door was from projectiles entering the vehicle and fragmenting. Morgan also agreed that transfer was a possibility. Morgan disagreed with Ernest's conclusion that a firearm had to have been fired from McGuire's vehicle because Morgan found the lead-test results more consistent with particulate lead resulting from fragmenting projectiles entering the vehicle. Morgan did not believe that the evidence led to the conclusion that weapons other than petitioner's must have been involved in this incident because, among other things, he could not exclude sportsmen or other individuals as the sources of the unidentified cartridge cases found by investigators.

FN 4: Morgan's full-time job was as a scientist for the Allegheny County Medical Examiner's Office in Pittsburgh, Pennsylvania, where he works in the firearms and tool mark section and part-time in the laboratory's mobile crime unit.

Craig Fries, a specialist in three-dimensional laser scanning and computer animation, created scans of the meadow and mapped the route of the vehicle pursuit. Based on his mapping of the route using GPS coordinates and Google Earth, Fries testified that the three .380–caliber cartridge cases found clustered on the road, which were not fired from petitioner's Ruger, were discovered approximately six-tenths of a mile from where petitioner claimed someone in McGuire's vehicle had shot at him. The .25–caliber cartridge cases were discovered 2.88 miles from that location.

Based on the three-dimensional scanning of the meadow and various measurements, including the location of the cartridge cases ejected from petitioner's AR–15 and the distance cartridge cases are ejected from that rifle, Fries concluded that, in the meadow, petitioner was near the driver's side front door of his pickup truck at the time he fired that weapon. The evidence, according to Fries, was consistent with a person being in the driver's seat or at the driver's door of the truck. Fries further opined that, at the time petitioner fired the AR–15 at the McGuire vehicle, the McGuire vehicle was at an 81–degree angle to petitioner's truck, approximately 50 feet away. Fries described the angle as "close to perpendicular."

**Petitioner's Case**

Kerri Wallin–Reed (Kerri), petitioner's wife,[5] testified that, in 2006, their cabin was burglarized. They reported the incident to the Plumas County authorities, but no one ever investigated the matter.[6]

FN 5: We use petitioner's wife's first name to avoid confusion.
FN 6: In his testimony in the People's case, Schermerhorn testified that petitioner kept a calendar on which he recorded break-ins that had occurred at the cabin. Schermerhorn had previously had a conversation with petitioner in which petitioner said local law enforcement did not come to the cabin to respond to reports of break-ins, and that he did not expect help with such matters from law enforcement.

Kerri testified that on July 2, 2011, at approximately 2:30 a.m., she and

13

petitioner were both awakened by a noise outside of the cabin. They got up to investigate, and both observed a very bright light shining in and around the cabin. Petitioner went to the front porch, and the light went away. Petitioner and Kerri's children woke up and asked what was happening. Kerri and petitioner were scared by the incident, and concerned for the safety of the family. This was not a normal occurrence at the cabin. However, Kerri testified that she did not recall hearing any type of gunshot that night.

On July 3, 2011, petitioner went to Reno to obtain a new generator. While he was away, a vehicle came all the way up the driveway to the cabin. This was also a very uncommon occurrence.

After dinner, Kerri watched a movie in the cabin with the children. Petitioner was on the porch with friends. Kerri fell asleep watching the movie, and later awoke and saw petitioner get into his truck and drive away. Kerri next saw petitioner when he returned. He was distraught and crying.

Richard Ernest, a forensic scientist for Alliance Forensics Laboratory, Incorporated, in Fort Worth, Texas, testified as an expert in the field of gunshot residue and residue analysis. In arriving at his conclusions, he analyzed photographs and reports prepared by others. Among other things, Ernest analyzed the gunshot residue reports prepared by the DOJ and RJ Lee, as well as the firearms analysis report prepared at the DOJ's laboratory.

Ernest observed that the three .380–caliber shell casings clustered together on the side of the road were not fired from petitioner's handgun. Based on those cartridge casings and the other unidentified casings collected in this case, Ernest concluded that at least four guns were involved: petitioner's .223–caliber Bushmaster rifle, petitioner's .380–caliber Ruger handgun, an unknown .380–caliber handgun, and a .25–caliber pistol.

Ernest testified that he did not observe evidence of bullet strikes on the passenger-side door of the McGuire vehicle, inside or out. Ernest did testify that it was within the realm of possibility that a bullet striking a different part of the vehicle could result in the lead detected in the area of the passenger-side door. However, Ernest testified that, under such circumstances, he would expect to discover evidence of some damage to that side of the vehicle or injury to the passengers riding on that side of the vehicle. Asked whether this meant that he could rule out the possibility that bullet strikes to other areas of the vehicle resulted in the presence of lead detected in the tests on the passenger side, Ernest responded: "I would say that it certainly leans that way. If there's no damage inside that car from bullets or bullet fragments over in that area and if that passenger, right front passenger, has not been struck by any bullet or bullet fragments, then that would lead indication [*sic*] that that didn't happen."

Asked a hypothetical question about whether a passenger seated in the front passenger side of a vehicle firing a gun towards the rear of the vehicle using his left hand would result in a pattern of residue consistent with that found on McGuire's front passenger door, Ernest responded: "It

14

certainly could be consistent with that, and further, he doesn't just have to be firing rearward with that; he could in fact—if the car is moving and there's wind blowing by that open window, he could be firing essentially straight out and he also could be firing with the gun somewhat inside that window inside the plane of where the window would be and firing outward from there.... And again, if he did such a thing, would we expect patterns somewhat similar to this? Yes."

Ernest testified that the gunshot residue RJ Lee looked for in performing their tests had nothing to do with bullet fragments. He further testified that, "whether it's a two-component or one-component particle, what RJ Lee has recognized here is that these particles came out of the barrel of a gun." Ernest further testified that, if an individual fired a gun from where Gonzalez was seated in the front passenger seat of the vehicle, then traveled almost four miles on foot, and then rinsed his hands with water, Ernest would expect that the individual would have washed off the gunshot residue particles that might have been on his hands. Gunshot residue washes off fairly easily. Nonetheless, some of the particles actually detected through the gunshot residue test performed on Gonzalez could be explained if, after washing his hands, he came into contact with an object on which those particles had settled, such as his clothing or handling a firearm.

As he concluded his direct testimony, Ernest read from the report he prepared for this case: "'In conclusion, it is the opinion [o]f this author, stated within a reasonable degree of scientific certainty, that an unknown and unrecovered firearm was discharged from the victim's vehicle.'" Ernest acknowledged other possibilities. However, based on the collection of cartridge cases not related to either of petitioner's guns, the presence of elements on the McGuire vehicle consistent with gunshot residue from the firing of a gun, the RJ Lee gunshot residue test results, the absence of damage to the front passenger area of the McGuire vehicle, and petitioner's statements that he was fired upon, Ernest believed that a gun was fired from the right front passenger area of the McGuire vehicle.

On cross-examination, Ernest acknowledged that he would "[p]robably not" expect to find the three .380–caliber cartridge cases which were not fired by petitioner's Ruger within eight to ten feet from one another if they were fired from a vehicle traveling approximately 50 miles per hour. However, Ernest observed that, when cartridge cases are ejected from a weapon, they can travel and carom in unpredictable directions. Thus, Ernest did not "put a great amount of stock by exactly where the cartridge cases are found at a particular shooting scene...." He also cautioned that one's perception of how fast one is traveling in a motor vehicle is often inaccurate. Ernest acknowledged that it was not uncommon for people to go out in rural areas and shoot guns, thus leaving behind cartridge cases. Ernest also acknowledged that it was not known whether certain cartridge cases were from bullets fired during the incident.

Also on cross-examination, Ernest acknowledged that, to create the pattern of residue found in a particular part of the McGuire vehicle by firing a gun backwards, the shooter would have had to place his arm out of the front passenger-side window and behind the side view mirror.

Ernest also testified that the fact that officers drew their weapons on

15

> Gonzalez and Tommy Chanley before subsequently handcuffing them at the campground gave rise to the risk of contamination with regard to one- and two-component particles.

ECF No. 26-1.

In an en banc decision, the California Supreme Court denied petitioner's petition for review on April 20, 2016.  ECF No. 27-24.

**B.  State and Federal Post Conviction Proceedings**

In his federal habeas application, petitioner raises three claims for relief.  ECF No. 1. First, he contends that the trial court's exclusion of a photo of one of the victims posted on Facebook violated his Sixth and Fourteenth Amendment rights to present a defense.  In his next claim for relief, petitioner asserts that his trial attorneys were ineffective for: 1) failing to properly prepare for trial; 2) failing to prepare and present impeachment evidence of the Facebook photo; and, 3) advising petitioner against accepting a formal plea offer.[3]  Lastly, petitioner challenges the effectiveness of his appellate attorney for failing to raise the ineffectiveness claims of his trial lawyers on direct appeal.

Before respondent filed an answer to this habeas application, petitioner filed a motion for a stay and abeyance.  ECF No. 7.  While that motion was pending before this court, petitioner filed a state habeas petition in the Plumas County Superior Court.  See ECF No. 27-27.  In that state habeas application, petitioner requested resentencing consideration under Senate Bill 620 which granted trial courts the discretion to strike gun enhancements in the interests of justice. ECF No. 27-27 at 9.  The Plumas County Superior Court denied that petition on March 21, 2018 based on lack of jurisdiction to re-sentence petitioner.  ECF No. 27-28.

On May 23, 2018, petitioner filed a state habeas corpus petition in the California Court of Appeal.  ECF No. 27-29.  He challenged his conviction on the basis that it "violates the Fifth, Sixth, and Fourteenth Amendments… in that it is based in material part on false evidence within the meaning of newly amended California Penal Code Section 1473(b)(3)(A)."  ECF No. 27-29 at 7. Petitioner also alleged that his trial attorneys had a Sixth Amendment duty to investigate and prepare to impeach the false evidence that was presented at his trial.  He did not claim that his

---

[3] As petitioner was represented by two attorneys at trial, the court refers to them in the plural.

1  trial attorneys were ineffective for failing to advise him to accept a plea offer.  The California

2  Court of Appeal denied this petition on June 7, 2018 in an unreasoned denial.  ECF No. 27-30.

3  In a state habeas petition filed on July 13, 2018 in the California Supreme Court,

4  petitioner raised the same false evidence and ineffective assistance of counsel claims initially

5  raised in the California Court of Appeal.  ECF No. 27-31.  On November 20, 2018, the California

6  Supreme Court denied petitioner's state habeas application.  ECF No. 27-32.  A copy of this

7  decision has not been provided by either party.

8  Petitioner filed a Notice of Exhaustion in this court on November 30, 2018.  ECF No. 22.

9  The stay of this case was lifted on December 12, 2018.  See ECF No. 23.

10  **II.    Legal Standards**

11  **A.  AEDPA Standard**

12  To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that

13  the state court decision resolving the claim on the merits "was contrary to, or involved an

14  unreasonable application of, clearly established Federal law, as determined by the Supreme Court

15  of the United States.  28 U.S.C. § 2254(d)(1).  The "contrary to" and "unreasonable application"

16  clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

17

18  > A federal habeas court may issue the writ under the "contrary to" clause if
   > the state court applies a rule different from the governing law set forth in
   > our cases, or if it decides a case differently than we have done on a set of

19  > materially indistinguishable facts. The court may grant relief under the
   > "unreasonable application" clause if the state court correctly identifies the

20  > governing legal principle from our decisions but unreasonably applies it
   > to the facts of the particular case. The focus of the latter inquiry is on

21  > whether the state court's application of clearly established federal law is
   > objectively unreasonable, and we stressed in Williams [v. Taylor, 529

22  > U.S. 362 (2000) ] that an unreasonable application is different from an
   > incorrect one.

23

24  Bell v. Cone, 535 U.S. 685, 694 (2002).

25  "A state court's determination that a claim lacks merit precludes federal habeas relief so

26  long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

27  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

28  664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

17

1   state prisoner must show that the state court's ruling on the claim being presented in federal court

2   was so lacking in justification that there was an error well understood and comprehended in

3   existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

4   The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

5   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

6   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

7   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

8   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

9   may constitute "clearly established Federal law," but circuit law has persuasive value regarding

10  what law is "clearly established" and what constitutes "unreasonable application" of that law.

11  Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

12  1057 (9th Cir. 2004).

13          Relief is also available under the AEDPA where the state court predicates its adjudication

14  of a claim on an unreasonable factual determination.  28 U.S.C. § 2254(d)(2).  The statute

15  explicitly limits this inquiry to the evidence that was before the state court.  See also Cullen v.

16  Pinholster, 563 U.S. 170 (2011).  Under § 2254(d)(2), factual findings of a state court are

17  presumed to be correct subject only to a review of the record which demonstrates that the factual

18  finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

19  light of the evidence presented in the state court proceeding."  It makes no sense to interpret

20  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in §

21  2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

22  same record could not abide by the state court factual determination.  A petitioner must show

23  clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

24  U.S. 333, 338 (2006).

25          If petitioner meets either of the 28 U.S.C. § 2254(d) standards, then the federal habeas

26  court reviews the merits of the constitutional claim under pre-AEDPA standards in order to be

27  entitled to relief.  Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).  While there is no

28  required order in which these two inquiries must be conducted, federal habeas courts generally

18

1    apply Section 2254(d) analysis first because it is a high hurdle for petitioners to overcome.

2           In applying these standards, federal courts review the last reasoned state court decision on

3    each claim for relief.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  "Where there has been

4    one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that

5    judgment or rejecting the same claim rest upon the same ground."  Ylst, 501 U.S. at 803; see also

6    Gill v. Ayers, 342 F.3d 911, 917 n. 5 (9th Cir. 2003) (explaining that federal courts "look

7    through" unexplained rulings of higher state courts to the last reasoned decision).  When there is

8    no reasoned state court decision or what is known as a silent denial, federal courts must conduct

9    an independent review of the record to determine what rational could support the state court

10   judgment and whether such rational was an objectively reasonable application of federal law.  See

11   Harrington v. Richter, 562 U.S. 86, 102 (2011); Cullen v. Pinholster, 563 U.S. 170 (2011);

12   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

13          **B.      Standards Governing Sixth Amendment Right to Present a Defense**

14          The Sixth Amendment to the Constitution guarantees the right of a criminal defendant to

15   have a public trial, to confront the witnesses against him and to obtain witnesses in his favor.

16   These guarantees are incorporated by the due process clause of the Fourteenth Amendment,

17   binding the states.  Due process includes a right to "'a meaningful opportunity to present a

18   complete defense.'"  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted).

19          The United States Supreme Court has not "squarely addressed" whether a state court's

20   exercise of discretion to exclude evidence violates a criminal defendant's right to present relevant

21   evidence.  Moses v. Payne, 555 F.3d 742, 758–59 (9th Cir. 2009).  Nor has it clearly

22   established a "controlling legal standard" for evaluating discretionary decisions to exclude such

23   evidence.  Moses, 555 F.3d at 758-59; see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir.

24   2011) (explaining that "[b]etween the issuance of Moses and the present, the Supreme Court has

25   not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and

26   the right to present a complete defense or 'establish[ing] a controlling legal standard' for

27   evaluating such exclusions.").  Indeed, the occasions in which the Supreme Court has found that

28   the exclusion of defense evidence in a state criminal trial violates the Sixth Amendment are rare.

                                                    19

1   See Rock v. Arkansas, 483 U.S. 44, 61 (1987) (finding state's *per se* rule excluding all

2   hypnotically refreshed testimony was arbitrary); Chambers v. Mississippi, 410 U.S. 284, 302

3   (1973) (holding that a state may not apply its evidentiary rules "mechanistically to defeat the ends

4   of justice."); Washington v. Texas, 388 U.S. 14, 22-23 (1967) (explaining that the state

5   evidentiary rule could not be rationally defended).

6        **C.     Standards Governing Ineffective Assistance of Counsel Claims**

7        The two prong Strickland standard governing ineffective assistance of counsel claims is

8   well known and oft-cited.  Strickland v. Washington, 466 U.S. 668 (1984).  It requires petitioner

9   to establish (1) that counsel's representation fell below an objective standard of reasonableness;

10   and, (2) that counsel's deficient performance prejudiced the defense.  Strickland, 466 U.S. at 692,

11   694.  "The question is whether an attorney's representation amounted to deficient performance

12   under 'prevailing professional norms,' not whether it deviated from best practices or most

13   common custom."  Harrington v. Richter, 562 U.S. 86, 105 (2011) (citing Strickland, 466 U.S. at

14   690).  Prejudice is found where "there is a reasonable probability that, but for counsel's

15   unprofessional errors, the result of the proceeding would have been different.  A reasonable

16   probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466

17   U.S. at 693.  "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result."

18   Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Richter, 562 U.S. 86, 111-12 (2011)).

19   In reviewing a Strickland claim under the AEDPA, the federal court is "doubly deferential" in

20   determining whether counsel's challenged conduct was deficient.  "When § 2254(d) applies, the

21   question is not whether counsel's actions were reasonable.  The question is whether there is any

22   reasonable argument that counsel satisfied Strickland's deferential standard."  Richter, 562 U.S.

23   86, 105 (2011).

24        **III.    Analysis**

25        **A. Sixth Amendment Right to Present a Defense Claim**

26        In his first claim for relief, petitioner contends that the trial court violated his right to

27   present a defense by excluding an undated Facebook photograph showing one of the victims

28   "holding a large knife with what appears to be a handgun tucked into the waistband of his pants."

20

1  ECF No. 26-1 at 3 (direct appeal opinion).  Petitioner argues that "[t]he photograph of John

2  Chan[l]ey with a gun establishes that [Cesar] Gonzales falsely testified at trial, as Gonzales

3  explicitly stated that neither he nor any of his friends had anything to do with guns…."  ECF No.

4  28 at 7.  In his traverse, petitioner attempts to change this claim by casting it as a Fourteenth

5  Amendment violation based on the knowing introduction of false testimony by the prosecution.

6  ECF No. 28 at 7-10.  However, no such claim was raised in his § 2254 petition nor briefed by

7  respondent and it will not be addressed herein.

8        This court looks to the last reasoned state court decision in applying the 28 U.S.C.

9  § 2254(d) standard.  Wilson v. Sellers, 138 S. Ct. 1188 (2018); see also Ylst v. Nunnemaker, 501

10  U.S. 797 (1991) (establishing the "look through" doctrine in federal habeas cases).  In this case,

11  the last reasoned state court decision denying this claim for relief is the California Court of

12  Appeal decision on direct appeal.  Therefore, this court is tasked with determining whether this

13  state court decision was contrary to or an unreasonable application of clearly established federal

14  law or unreasonably determined the facts in light of the evidence presented at trial.  28 U.S.C. §

15  2254(d).

16        In its reasoned opinion, the California Court of Appeal first concluded that "because

17  [petitioner] could not establish when the photograph was taken, he did not establish that it was

18  relevant."  ECF No. 26-1 at 20.  Specifically, the court reasoned that:

19        [T]he fact that John Chanley was photographed with a gun at some
       indeterminate time, under unknown circumstances, does not have
20        any tendency in reason to prove either that he or someone else in the
       McGuire vehicle had a gun on the night of the shooting, or that
21        Gonzalez lacked credibility when he testified that his group of
       friends was just 'a whole bunch of kids,' and, with regard to
22        possessing firearms, they were 'not like that.'

23  ECF No. 26-1 at 23.  Although the California Court of Appeal found no error in refusing to admit

24  the photograph, even assuming error, the court found its exclusion was harmless beyond a

25  reasonable doubt under the Watson standard of review.[4]  See People v. Watson, 46 Cal.2d 818

26  _____

27  [4] Petitioner argued on appeal that the Chapman standard of harmless error applied because the
   evidentiary ruling violated his constitutional right to present a defense.  See Chapman v.
   California, 386 U.S. 18, 24 (1967) (defining the standard of harmlessness as "harmless beyond a
28  reasonable doubt.").  The California Court of Appeal expressly rejected this argument.  See ECF

21

1    (1956); People v. Beltran, 56 Cal.4th 935, 956 (2013)(explaining that the focus of the Watson

2    standard "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have

3    done in the absence of the error under consideration.") (emphasis in original); ECF No. 26-1 at

4    25-28.  In determining the standard of review to be applied, the court reasoned that petitioner's

5    right to present a defense was not infringed in light of the "vigorous case for self-defense" that

6    was presented at trial through defendant's taped statements to police as well as Ernest's expert

7    testimony.  ECF No. 26-1 at 25-26.  Ultimately, in applying Watson harmless error review, the

8    California Court of Appeal found the defense theory of the case "overwhelmingly" contrary to the

9    evidence presented at trial.  ECF No. 26-1 at 26.

10                      The actions of the occupants of the McGuire vehicle-shining a
                        spotlight, waiving a white 'flag,' fleeing on foot from the vehicle
11                      once it stopped in the case of the Chanley brothers and Gonzalez, not
                        shooting at [petitioner] when he walked up to the vehicle-are not
12                      consistent with what would be expected of armed individuals being
                        pursued and repeatedly fired upon.
13

14   ECF No. 26-1 at 27.  There was no reasonable probability that the jury would have reached a

15   different verdict had the single photograph been admitted thus rendering its exclusion harmless.

16   ECF No. 26-1 at 28.  Indeed, the state court did not stop there.  The California Court of Appeal

17   further concluded that even applying Chapman harmless error review, the exclusion of the

18   photograph was "harmless beyond a reasonable doubt."  ECF No. 26-1 at 28.

19          For purposes of analysis, this court assumes *arguendo* that the exclusion of the Facebook

20   photograph was constitutional error, but concludes that the error was harmless.[5]  On federal

21   habeas review, an error is harmless unless it "had [a] substantial and injurious effect or influence

22

23   No. 26-1 at 25-26.
     [5] In so doing, the court emphasizes that this is being done in the interests of judicial economy
24   because a criminal defendant's right to present a defense is subject to reasonable restrictions.
     Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009).  The weight of authority finds no clearly
25   established federal law supporting petitioner's argument that a state evidentiary ruling, even if
     erroneous, supports the granting of habeas relief under the AEDPA.  See Brown v. Horell, 644
26   F.3d 969, 983 (9th Cir. 2011)(emphasizing the lack of Supreme Court authority "squarely
     address[ing]" a trial court's discretionary exclusion of evidence or "establish[ing] a controlling
27   legal standard for evaluating such exclusions."); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th
     Cir. 2009).
28

                                                     22

1   in determining the jury's verdict," i.e., it resulted in "actual prejudice."  Brecht v. Abrahamson,

2   507 U.S. 619, 637 (1993) (citation omitted).  If, after reviewing the "facts as a whole," this court

3   can determine "with fair assurance that the judgment was not substantially swayed by the error,

4   we may conclude that the error was harmless."  Id. (citing Kotteakos v. United States, 328 U.S.

5   750, 765 (1946)). In this case, the overwhelming nature of the evidence contradicting petitioner's

6   defense at trial was highlighted by the state court's rejection of this claim on direct appeal under

7   any standard of review.  Petitioner's counsel presented a theory of defense which the jury simply

8   found was not credible based on the overwhelming evidence of petitioner's use of multiple

9   firearms during the course of a 7 mile pursuit of the victims' car and his shifting stories to the

10  police.  Even with all the expert evidence presented at trial, the jury reached its verdict in less

11  than three hours.  See ECF No. 27-6 at 146 (trial court minute order).  After reviewing the record

12  and the state court rejection of this claim, the undersigned concludes that the exclusion of the

13  Facebook photograph of John Chanley did not have a "substantial or injurious effect" on the

14  jury's verdict.  See Brecht, 507 U.S. at 637.  Therefore, petitioner is not entitled to habeas relief

15  on his Sixth Amendment right to present a defense claim.

16      **B.  Ineffective Assistance of Counsel**

17          In his remaining claims for relief, petitioner raises several challenges to his trial and

18  appellate counsels' effectiveness.  Although respondent asserts that some of these claims have not

19  been properly exhausted despite the stay and abeyance that was granted, the undersigned assumes

20  without deciding that these claims have been fully exhausted on state habeas review.  See ECF

21  No. 17 (Findings and Recommendations to grant petitioner a Rhines stay and abeyance); see also

22  28 U.S.C. § 2254(b)(2) (allowing unexhausted claims to be denied on the merits).  However,

23  there is no reasoned state court opinion denying any of petitioner's ineffective assistance of

24  counsel claims.  In the absence of a reasoned state court opinion, this court conducts an

25  independent review of the record to determine what rational could support the state court

26  judgment and whether such rational was an objectively reasonable application of federal law.  See

27  Harrington v. Richter, 562 U.S. 86, 102 (2011); Cullen v. Pinholster, 563 U.S. 170, 188 (2011);

28  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

1

**1.  Ineffective Assistance of Trial Counsel Claims**

2      In his first ineffective assistance claim, petitioner faults his trial attorneys for failing to

3  properly prepare for trial.[6]  Although it is not entirely clear how his attorneys failed to prepare, it

4  appears related to the Facebook photo of John Chanley.  In his habeas petition filed in the

5  California Supreme Court, petitioner faults his counsel for not being "prepared to impeach Cesar

6  Gonzalez's testimony, as counsel was aware for over a year of the existence of the photograph."

7  ECF No. 27-31 at 17.  In his second ineffective assistance claim, petitioner asserts that his trial

8  attorneys failed to subpoena John Chanley in order to get the Facebook photo admitted into

9  evidence.  As both of these claims relate to how counsel could have sought to admit the Facebook

10  photo, the court will address them collectively.  Critically missing from petitioner's habeas

11  application is any affidavit from John Chanley, or anyone else for that matter, who would have

12  testified that the photograph at issue was taken prior to the date of the shooting in this case.

13  Absent such evidence, petitioner cannot demonstrate any prejudice resulting from trial counsels'

14  asserted failures.  See Strickland, 466 U.S. at 668.  The trial court excluded the Facebook

15  photograph because there was no evidence that it was taken before the crime thus rendering it

16  irrelevant.  Petitioner has not come forward with any evidence that his trial attorneys could have

17  changed the outcome of the proceeding.  See Pinholster, 563 U.S. at 190 (emphasizing that

18  petitioner "must demonstrate that it was necessarily unreasonable for the California Supreme

19  Court to conclude: (1) that he had not overcome the strong presumption of competence; and (2)

20  that he had failed to undermine confidence in the jury's sentence…").  Having conducted an

21  independent review of the record, the state habeas court could have denied these ineffective

22  assistance of counsel claims based on lack of prejudice as an objectively reasonable application of

23  Strickland.  See Harrington, 562 U.S. at 105 (emphasizing that "the question is not whether

24  counsel's actions were reasonable.  The question is whether there is any reasonable argument that

25  counsel satisfied Strickland's deferential standard."); Strickland v. Washington, 466 U.S. at 696

26  (emphasizing that "a verdict or conclusion only weakly supported by the record is more likely to

27

28
[6] Petitioner was represented by two lawyers during trial.  Therefore, the court refers to counsel in the plural when discussing these claims.

1   have been affected by errors than one with overwhelming record support.").  Thus, petitioner's

2   ineffective assistance of trial counsel claims should be denied.

3          In his final ineffective assistance of trial counsel claim, petitioner asserts that his lawyers

4   should have advised him to accept a plea offer rather than go to trial.  However, petitioner never

5   explains nor offers any evidence of what plea offer was communicated to his attorneys, much less

6   that he would have accepted the plea upon counsels' advice.  See Lafler v. Cooper, 566 U.S. 156,

7   164 (2012) (explaining that "a defendant must show that but for the ineffective advice of counsel

8   there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*,

9   that the defendant would have accepted the plea and the prosecution would not have withdrawn it

10  in light of intervening circumstances), that the court would have accepted its terms, and that the

11  conviction or sentence, or both, under the offer's terms would have been less severe than under

12  the judgment and sentence that in fact were imposed.").  Likewise, no evidence of any plea offer

13  was presented by petitioner in any of his state habeas petitions.  In light of this silent record, the

14  state habeas court could have rejected this claim based on petitioner's failure to establish a prima

15  facie case of ineffective assistance which this court finds would have been an objectively

16  reasonable application of clearly established federal law.

17          **2.  Ineffective Assistance of Appellate Counsel Claims**

18          Petitioner's last claim relates to the conduct of his appellate counsel for not raising the

19  ineffectiveness claims against his trial lawyers on direct appeal.  As this court noted in its prior

20  Findings and Recommendations, "[u]nder California law, ineffective assistance of trial counsel

21  claims that are not clear from the record should be raised in state habeas corpus proceedings and

22  not on direct appeal.  See People v. Lucas, 12 Cal.4th 415, 437 (1995) (stating that "[r]eviewing

23  courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the

24  record on appeal affirmatively discloses that counsel had no rational tactical purpose for (his or

25  her) act or omission.") (quoting People v. Zapien, 4 Cal.4th 929, 980 (1993)).  Since there is no

26  suggestion by petitioner that his trial attorney's errors were clear from the trial transcripts, there is

27  no potential merit to his claim that appellate counsel was ineffective for not challenging his trial

28  attorney's performance on direct appeal.  This is especially true because one of petitioner's

25

ineffective assistance of trial counsel claims is based on plea discussions which are generally not made a part of the state court record on appeal." ECF No. 17 at 5, n. 2. Even without referencing state law, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). Thus, the undersigned finds that the state habeas court could have determined that petitioner did not establish a prima facie case of ineffectiveness based on appellate counsel's lack of deficient performance under Strickland. See Harrington v. Richter, A fairminded jurist could not find that conclusion to be an objectively unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

Based on the above analysis, the undersigned recommends denying petitioner's ineffective assistance of counsel claims on the merits.

**IV.    Plain Language Summary for Pro Se Party**

The following information is meant to explain this order in plain English and is not intended as legal advice.

The court has reviewed your habeas corpus application and the trial court record in your case. The undersigned is recommending that your habeas petition be denied on the merits. If you disagree with this result, you have 14 days to explain why it is incorrect. Label your explanation "Objections to Magistrate Judge's Findings and Recommendations." The district court judge assigned to your case will then review the entire record and make the final decision in your case.

**V.    Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner

26

1  may address whether a certificate of appealability should issue in the event he files an appeal of

2  the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

3  court must issue or deny a certificate of appealability when it enters a final order adverse to the

4  applicant).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant

5  has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

6  Any response to the objections shall be served and filed within fourteen days after service of the

7  objections.  The parties are advised that failure to file objections within the specified time may

8  waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

9  1991).

10  Dated:  September 7, 2022

11  
CAROLYN K. DELANEY
12  UNITED STATES MAGISTRATE JUDGE

18  12/wall1495.F&R.merits.docx

27